USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/12/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
CALEB JAMEL HOOKER,             :
                   Plaintiffs,  :
:                11 Civ. 2840 (LGS)
       -against-          :
:                OPINION & ORDER*
UNITED STATES OF AMERICA,       :
                   Defendants.  :
:
-------------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

    Plaintiff Caleb Jamel Hooker brings this action against the United States for its alleged failure to protect him from attack by another inmate. In this action, brought under the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346, 2671-2680, he charges that Bureau of Prisons (the "BOP") employees at the Metropolitan Correctional Center ("MCC") failed to follow proper procedure, and thereby allowed Ely Mejia to attack him with a contraband weapon.

    Plaintiff was attacked by Mr. Mejia while incarcerated at the MCC. The attack left him bloodied, with an open gash on the left side of his face. Mr. Hooker received 25 stitches and has a scar down his left cheek as a result of the attack. Were he able to sue and recover any damages from his attacker, Ely Mejia, for an intentional tort, Mr. Hooker likely would have been able to find redress for Mr. Mejia's senseless attack. As is sometimes the case in our tort system, the Plaintiff, by no fault of his own, is without relief from the person primarily responsible for his injury. *See, e.g.* Stephen G. Gilles, *The Judgment-Proof Society*, 63 Wash & Lee L. Rev. 603 (2006). While the Government failed to prevent the attack, it cannot be held liable unless it is found to be negligent in a manner not covered by the Discretionary Function Exception to the FTCA.

---

* This opinion is partially redacted. The unredacted version is filed under seal.

Judgment will be entered in favor of the defendant United States for the reasons stated in the below findings of fact and conclusions of law, issued pursuant to Fed. R. Civ. P. 52.

**I. Findings of Fact**

  **A. The Attack and Preceding Events**

The following facts generally are not in dispute.  Plaintiff was incarcerated at the MCC from March 9, 2009, through the date of the assault at issue, December 4, 2009.  Mr. Mejia also was incarcerated at the MCC from August 12, 2009, through the date of the assault.  From November 27, 2009, through December 4, 2009, Plaintiff and Mr. Mejia were both housed in Seven South.

At the MCC, general population inmates are allotted one hour of recreation time every other day.  On December 4, 2009, 34 inmates from Seven South, including Plaintiff and Mr. Mejia, participated in recreation from approximately 2:20 p.m. to 3:20 p.m.  At the MCC, the recreation area is located on the facility roof.  On the day of the assault, recreation officers Brian Polito and Daniel Murray were supervising the recreation area.  To go to the roof for recreation, inmates first must exit their housing unit into a "sally port," a secure elevator bank located between the two wings of the housing units on a given floor.  The inmates then take an elevator to the roof.  On the day of the assault, the MCC officer supervising Seven South was Serena Wingate.

Around 2:20 p.m., Officer Murray went to the seventh floor to supervise the inmates after they exited Seven South and entered the seventh floor sally port for transport to the roof.  As inmates from Seven South arrived on the roof on the day of the assault, they were supervised by Officer Polito.  Once all of the Seven South inmates were on the roof, Officers Murray and Polito supervised them.

While Plaintiff was watching a handball game during recreation, he exchanged words with Ely Mejia, another inmate.  Mr. Hooker said that Mr. Mejia believed that Mr. Hooker and another inmate were talking about Mr. Mejia.  Approximately 10 minutes later, Mr. Mejia came up from behind Mr. Hooker and

slashed his face with a contraband weapon consisting of three razor blades taped together with postage stamps.  Mr. Hooker sustained a puncture wound near his left eye and a laceration down the left side of his face, stretching from his eye to his chin, and requiring 25 stitches to close.

    B.  **MCC Policies and Procedures**

Under MCC and BOP policy, inmates in the general population were allowed to possess a disposable razor with a multi-blade cartridge.  Removing the razor blades from a cartridge was prohibited, and any razor blades found were to be confiscated as contraband.   MCC policy required that all inmates be pat searched when they went from a housing unit to recreation, but did not require that they be "wand" searched with a handheld metal detector.  BOP policy generally required searches of inmates, their housing and work areas to locate contraband, and the MCC had a daily search procedure in which all areas of the institution were inspected.  It was MCC policy to provide a safe environment through a planned system of supervision and security inspections.

Although there is no step-by-step written procedure setting forth how to perform a pat search, officers were trained in it multiple times.  A correct pat search is performed as follows: the inmate approaches, the officer takes a quick look at the inmate in order to observe his demeanor; the inmate turns around and puts their hands on the wall or puts their hands out to their sides, whichever they feel more comfortable doing; the officer starts patting from the collar, and works her way down from their shoulders, patting one arm at a time; the officer then pats down to the center of the back and works her way down the shoulder blades, then the sides of the torso, the center of the chest, and down to the waist area; once the officer gets to the waist area, the officer checks to see if the inmate is wearing a jumpsuit or pants, checking where the elastic seam is on the person; the officer then searches the legs from the groin to the tops of the shoes, one leg at a time.

    C.  **Officer Wingate's Practice**

Officer Wingate, who was tasked with performing the mandatory pat search on the day of the assault, testified to, and demonstrated, her general practice of pat searching inmates. Officer Wingate has followed the practice described above generally, and almost always did so with a wand metal detector in her hand. After she receives a phone call from one of the recreation officers stating that he is on his way to her housing unit, Officer Wingate's practice was to announce to the inmates that it was time for recreation. The inmates then lined up by the door to the housing unit. Officer Wingate would go to the door and wait for the recreation officer to arrive in the sally port. Once the recreation officer arrived in the sally port, Officer Wingate would open the door to the housing unit and situate herself in the doorway, with one foot in the sally port and the other foot in the housing unit. Officer Wingate typically would hold the door open with her lower back or buttocks while conducting the search. While standing in the doorway, Officer Wingate typically would pat and wand search each inmate.

When Officer Wingate finished her pat and wand search, she would send the inmate into the sally port, where the recreation officer was waiting to direct the inmate onto the elevator. Another MCC officer is inside the elevator who is responsible for operating the elevator. Once there were 12 inmates on the elevator, the elevator operator would take that group of 12 inmates to the roof while Wingate continued to pat and wand search the remaining inmates. The recreation officer remains in the sally port to supervise the inmates once they have been searched and, when the elevator returns, to direct the next group of inmates onto the elevator. The recreation officer would accompany the last group of inmates to the roof. Officer Wingate stated that she had always pat searched and wand searched all inmates.

If an inmate was wearing a hat, Officer Wingate typically would make the inmate take the hat off. If the inmate had large amounts of hair, Officer Wingate typically made the inmate shake his hair out. Officer Wingate also sometimes searched inmates' mouths and shoes based on her judgment. It would take Officer Wingate approximately 20 to 25 seconds to perform a pat and wand search per person. Inmates

also were permitted to bring cups of water and radios onto the roof. Officer Wingate would allow the inmates to hold the cups of water in their hands while she performed the search.

### D. Officer Wingate's Procedure on December 4, 2009

The parties dispute Officer Wingate's actions on December 4, 2009, the day of the assault. Officer Wingate testified that she knows that she patted down and wand searched Mr. Mejia that day. She testified to that fact because she, to her recollection, has never deviated from her routine. Mr. Hooker disputes that recollection, and testified that Officer Wingate did not pat search the inmates on that day. At his deposition, however, Mr. Hooker testified that he recalled being pat searched – but not wand searched – on his way to the recreation area.

Plaintiff suggests that Officer Wingate's failure to file a contemporaneous memo stating that she pat searched inmates that day and her status as a probationary employee makes it more likely that she failed to conduct the pat search. The Defendant contends that Officer Wingate's status as a probationary employee suggests she had particular incentive to follow the rules, that Officer Murray would have recalled witnessing Officer Wingate fail to search inmates and that Officer Wingate had a reputation for being careful and deliberate in her searches.

Officer Wingate's pattern and practice is highly persuasive to the Court. While the Court found Officer Wingate and Mr. Hooker both generally credible as witnesses, the Plaintiff has the burden of proof and failed to establish by a preponderance of the evidence that Officer Wingate did not pat search the inmates on December 4, 2009.

### E. Searching and Supervision of the Recreation Area

There is no disagreement that Officers McDermott, Murray, and Polito properly searched the recreation area on the day of the assault, shaking down the blue safety padding on the walls among other spots that could be used to hide contraband.

During the recreation period, Officers Polito and Murray were supervising the recreation area. The recreation area is divided into two parts by the sally port. Typically, Officers Polito and Murray each pick a side of the roof to supervise, one standing on each side of the sally port. Officers Polito and Murray explained that when one of them needed to use the bathroom or go to the equipment shed, their practice was to inform the other.

When the attack occurred, Officer Murray was in the area near the sally port from which inmates arrive at the recreation area. Officer Murray did not witness the assault, but saw Mr. Hooker and Mr. Mejia fighting, intervened, and pulled Mr. Hooker to another side of the recreation area, hit the alarm, and asked another inmate to get Officer Polito. When the attack happened, Officer Polito was in an equipment shed searching for game supplies for another inmate. An inmate came and found Officer Polito during the attack. Upon arriving where the fight was occurring, Officer Polito found Mr. Hooker isolated by Officer Murray while Mr. Mejia and another inmate continued to fight. Officer Polito isolated the fighting inmates from the rest of the inmates in the recreation area in order to prevent a larger fight.

### G. The Placement of Ely Mejia in General Population

BOP and MCC policy required that each inmate entering the MCC be evaluated by corrections and medical personnel to determine whether the inmate was fit for general population. Mr. Mejia entered the MCC in 2009, during which there was a standard process in place to evaluate inmate fitness. The inmate was given a psychological survey and seen by a physician or physician's assistant for medical evaluation. If the psychological questionnaire indicated any suicidal tendencies, an on-call psychologist would see the inmate immediately. Otherwise, the inmate was placed in the Special Housing Unit (the "SHU") and a psychologist reviewed the survey and other relevant information to determine whether or not an inmate needed a psychological evaluation.

Before releasing inmates from the SHU to general population upon arrival, the inmate was discussed at a weekly SHU meeting. At each meeting, prison employees discussed any concerns about SHU inmates and their fitness to be in the general population. Mr. Mejia entered the MCC on August 12, 2009, at 7:15 PM. He filled out the psychological questionnaire, and was seen by a physician's assistant at 8:52 p.m. He was placed in the SHU that night at 10:32 p.m. On August 13, 2009 Mejia was seen by Dr. Elissa Miller, a psychologist. Dr. Miller saw Mr. Mejia because he [REDACTED]. Dr. Miller evaluated Mr. Mejia three times in 2009 and believed him fit for general population.

On October 13, 2009, Mr. Mejia was involved in an altercation with another inmate. As a result of this incident, Mr. Mejia was segregated from other inmates and placed in the MCC's SHU from October 13, 2009, through November 27, 2009, while he awaited adjudication of the resulting disciplinary charges. On November 24, 2009, Mr. Mejia was found guilty of violating an MCC rule in connection with the altercation. On November 27, 2009, Mr. Mejia was released from the SHU and placed in Seven South. In his history in the Federal penal system, Mr. Mejia was disciplined for fifteen infractions and violations of institutional policy, but before the attack on Mr. Hooker, he had been disciplined for only one physical altercation.

## II. Conclusions of Law and Discussion

### A. Plaintiff's Claims

Plaintiffs claim arises under the FTCA. The FTCA is a waiver of the traditional sovereign immunity enjoyed by the United States, and allows a private citizen to sue the United States for injuries caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

Plaintiff alleges three theories of negligent conduct in the MCC's failure to prevent Mr. Mejia from attacking Plaintiff while he was in MCC custody.  First, Plaintiff alleges that Officer Wingate failed to pat search or negligently performed her pat search of inmates as they left the housing unit on their way to recreation, allowing Mr. Mejia to bring a razor blade to the recreation area.  Second, Plaintiff alleges that the MCC's decision to place Mr. Mejia in the general population was negligent.   Third, Plaintiff alleges that the guards were negligent in their supervision of the recreation area.

### B. The Discretionary Function Exception

The Discretionary Function Exception limits the ability to sue the Government and provides that the FTCA shall not apply to "Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."   28 U.S.C. § 2680(a).

The exception prevents "judicial second-guessing" of "legislative and administrative decisions grounded in social, economic, and political policy" that reflect trade-offs made under constrained budgets.  *See United States v. Gaubert,* 499 U.S. 315, 323 (1991) (internal quotation marks and citations omitted).  According to *Gaubert*, the Discretionary Function Exception bars suit only if: (1) the acts alleged are discretionary, in that they involve an "element of judgment or choice" and are not mandated by statute or regulation and (2) the judgment is grounded in "considerations of public policy" or susceptible to policy analysis.  *See Gaubert,* 499 U.S. at 322-23; *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988).

"[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations."  *Gaubert,* 499 U.S. at 324; *accord Enigwe v.*

*Zenk,* 2007 WL 2713849, at *9 (E.D.N.Y. Sept.14, 2007).  This presumption may be rebutted, however, upon a showing that "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert,* 499 U.S. at 324–35.

The internal security of prisons normally is left to the discretion of prison administrators.  *Rhodes v. Chapman,* 452 U.S. 337, 349 n.14 (1981).  The BOP is charged with the "management and regulation of all Federal penal and correctional institutions" and the duty to "provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses." 18 U.S.C. § 4042(a).  The statute provides only that the BOP has a duty of care, but does not address the particular manner by which the BOP must fulfill this duty.  "The absence of specific guidelines of appropriate conduct by BOP officials in administering these duties, therefore, leaves judgment or choice to the BOP officials." *Scrima v. Hasty,* No. 97 Civ. 8433, 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998).

On the other hand, negligence and carelessness in the failure to carry out duties is a different sort of negligence.  If an official is distracted or inattentive, or too lazy to report a problem, those negligent acts neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy.  *See Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2000); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 476 (2d Cir.2006).  Likewise, "[c]ertain acts, although discretionary, are not covered by the exception because they involve 'negligence unrelated to any plausible policy objective.'" *Doe v. U.S.,* 2010 WL 3562568, at *4 (S.D.N.Y. 2010) (citing *Coulthurst,* 214 F.3d at 109).  This carve-out to the Discretionary Function Exception is referred to as the "negligent-guard theory." *Triestman,* 470 F.3d at 475.

### C. Theories of Liability

#### i. Officer Wingate's Patdown

Under the FTCA, the Government's liability turns on the tort law of the state where the tort occurred. 28 U.S.C. § 1346(b). "Under New York law…a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof." *Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111, 114 (2d Cir. 2000). Although state law sets out the elements required to prove negligence, the standard of care for the BOP is fixed by 18 U.S.C. § 4042, which requires that the BOP provide "suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States." This statutory duty means that the BOP must exercise "ordinary diligence" or reasonable care "to keep prisoners safe and free from harm." *See Smith v. United States*, 207 F. Supp. 2d 209, 214 (S.D.N.Y. 2002). New York law is consistent with federal law -- the State owes a duty of care to safeguard inmates, even from attacks by fellow inmates. "Like other duties in tort, the scope of the State's duty to protect inmates is limited to risks of harm that are reasonably foreseeable." *Sanchez v. State of New York*, 99 N.Y.2d 247, 253 (2002).

Plaintiff failed to carry his burden to prove that Officer Wingate breached her duty of care, and also failed to carry the burden of establishing damages as a result of Officer Wingate's conduct. The evidence points to Officer Wingate having pat and wand searched the inmates in a manner consistent with her duty of ordinary diligence. Plaintiff urges the Court to find that Officer Wingate acted negligently applying the doctrine of *res ipsa loquitor*. However, Plaintiff failed to establish *res ipsa loquitor*. To establish negligence under that doctrine, Plaintiff must show that the event: 1) was of a kind that ordinarily does not occur in the absence of someone's negligence, 2) was caused by an agency or instrumentality within the exclusive control of the defendant, and 3) was not due to any voluntary action or contribution on the part of

the plaintiff.  *See Velez v. Sebco Laundry Sys., Inc.,* 178 F. Supp. 2d 336, 339-40 (S.D.N.Y. 2001).  Plaintiff failed to show that Mr. Mejia's attack ordinarily does not occur in the absence of negligence.  As Plaintiff argued, attacks of this sort are very rare.  Diligent searches might prevent almost all such attacks, and still may not have prevented Mr. Mejia from sneaking the razor blades into the recreation area.

Even if Plaintiff could have proven some negligence in the manner in which Officer Wingate conducted the patdown, the conduct of a patdown is covered by the Discretionary Function Exception.  Officer Wingate is required to conduct patdown searches of inmates as they leave housing units.  The manner and speed with which those searches are conducted involve discretion.  This discretion includes consideration of efficiency and safety, and therefore includes considerations of public policy covered by the Discretionary Function Exception.  *See, e.g., Pupo-Leyvas v. United States*, No. 08 Civ. 344, 2010 WL 3782183 (S.D. Ind. Sept. 20, 2010) (holding that the discretionary conduct in patdown searches of inmates was covered under the Discretionary Function Exception).  Officer Wingate's conduct would be exempt from the Discretionary Function Exception only if it qualified under the negligent guard theory, and in order to do so, would likely require that Officer Wingate did not conduct any patdown search at all.  The Plaintiff did not establish beyond a preponderance of the evidence that Officer Wingate failed to conduct a patdown search of Mr. Mejia on the day of the assault.

### ii. The Placement of Mr. Mejia in General Population

The Plaintiff argues that the Defendant was negligent in placing Mr. Mejia in the general population, and that negligence caused the Plaintiff's injuries.  Plaintiff failed to establish that the MCC acted negligently in placing Mr. Mejia in the general population.  Nothing in the record established that MCC employees deviated from the standard procedure for classifying inmates.  Mr. Mejia was evaluated upon arrival at the MCC at a weekly SHU meeting, and had been cleared by a physician's assistant, a psychologist, and a psychiatrist.  While Plaintiff marshaled considerable evidence that Mr. Mejia had a

number of prior disciplinary infractions, and [REDACTED], Plaintiff did not demonstrate that Defendant failed to properly evaluate Mr. Mejia in light of that concern.

Even if Plaintiff could establish negligent conduct by the MCC in the classification of Mr. Mejia, that claim would be barred by the Discretionary Function Exception. *Santana-Rosa v. United States*, 335 F.3d 39, 44 (1st Cir. 2003) (precluding a claim based upon the classification of inmates noting that "at least two other" Circuit courts reached the same decision); *see also Taveras v. Hasty*, No. 02 Civ. 1307, 2005 WL 1594330, at *4 (E.D.N.Y. July 7, 2005) (claim that prison failed to segregate dangerous inmate is covered by Discretionary Function Exception). Plaintiff would need to show that the inmate classification falls under the lazy guard theory, and show that the classification was a result of laziness or carelessness. *Taveras*, 2005 WL 1594330 at *4. There is no evidence in the record to establish that the MCC's classification of Mr. Mejia fell to that level.

### iii. Supervision of the Recreation Area

The Plaintiff does not contend that the search of the recreation area was negligent on the day of, or in the days preceding the attack. The Plaintiff does assert that the supervision of the recreation area by Officers Polito and Murray was negligent. Officer Polito testified that he was searching for game supplies in the shed during the time when the inmates were on the roof, leaving only Officer Murray to supervise both sides of the roof, when only one side could be seen by a single person at any given time. Moreover, it appears that from the vantage point of where Officer Murray stood, which was where the officers ordinarily stood, parts of the recreation area were not visible. The supervision of the recreation area under these circumstances may have deviated from a standard of ordinary diligence. The question is a close one that the Court need not decide, since the Plaintiff has not proved causation. Mr. Mejia, as demonstrated by the video of the attack, quickly rushed up to Mr. Hooker and slashed him across the face as he was sitting

watching handball.  Even if Officers Polito and Murray had been watching both sides of the recreation area, there is no evidence that they could have prevented the attack.

Even if the Plaintiff were able to prove causation – i.e., that the actions of Officers Murray and Polito in their supervision of the recreation area caused the injury to Mr. Hooker -- their actions would be covered by the Discretionary Function Exception.  While the MCC mandates that two officers supervise the recreation area at all times, it does not mandate a particular course of action while doing so.  It is not contrary to that mandate to be in the shed in the recreation area, whether doing so was negligent or legitimate.  The policy does not state that there must be one officer supervising *each* side at a given time, but mandates only that there be two officers supervising.  Officer Polito's decision to go to the equipment shed at the request of an inmate was discretionary and within his duty to supervise.  Officer Polito had to weigh the prison's duty, and therefore his duty, to provide recreation activities (28 C.F.R. § 544.32), against his responsibility to supervise the recreation area.  Officer Polito's conduct was not lazy or careless in a manner that triggers the lazy guard exception.

### iv. Damages

Plaintiff also failed to establish more than limited damages.  Mr. Hooker testified that he sometimes had nightmares about the injury, that the scar running down his face has potentially made it more difficult for him to find a job, and that his daughter found his scar difficult to look at.  No damages from these issues were proved by a preponderance of the evidence.  Regarding employment, "[u]nder New York law, an award for loss of income must be established to a reasonable certainty given the plaintiff's earning capacity both before and after the accident giving rise to the suit . . . Such an award cannot be based on mere conjecture alone." *Carroll v. U.S.*, 295 Fed. Appx. 382, 384 (2d Cir. 2008).  Mr. Hooker never sought treatment for any emotional distress, making that claim for damages difficult to credit.

### III. Conclusion

  For the reasons set forth above, the Clerk of the Court shall enter judgment against plaintiff dismissing all the claims in the complaint, with prejudice and without costs.

New York, NY
July 12, 2013

                      LORNA G. SCHOFIELD
                      UNITED STATES DISTRICT JUDGE